STATE OF MAINE
YORK, SS.
SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-15-97

NORMAN GAUDETTE,

Plaintiff,

v.                                                                          **ORDER**

TERRY DAVIS,

Defendant.

## I. Background

### A. Procedural Posture

Plaintiff Norman Gaudette filed this action against Defendant Terry Davis bringing various claims arising out of alleged defamatory statements. Before the court is the defendant's special motion to dismiss Gaudette's claims under Maine's anti-Strategic Lawsuits Against Public Participation ("SLAPP") statute.

### B. Facts

The following facts are drawn from the complaint and affidavits filed by the parties in conjunction with the special motion to dismiss procedure.

Norman Gaudette and Terry Davis are both former officers at the Biddeford Police Department. Gaudette supervised Davis. In the early 1990s, allegations surfaced that Gaudette had sexually abused young boys, prompting an internal investigation by the Biddeford P.D. Davis personally interviewed Larry Ouellette, one of the alleged victims who accused Gaudette. The Attorney General's Office conducted a separate

investigation. The investigations did not ultimately result in criminal charges or employment consequences for Gaudette. Evidence collected during the investigations was presented to a grand jury, but the grand jury returned a no bill. The allegations and investigations have recently been the subject of significant public, political, and media attention.

When Davis learned about recent renewed public and media attention to the allegations and investigation, Davis reached out to Matthew Lauzon, an alleged victim of sexual abuse at the hands of other former Biddeford P.D. officers. Davis provided Lauzon with a letter ("the Letter") to read aloud at a public hearing held on the matter by State Senator David Dutremble.

Around the time of the Dutremble hearing, the media contacted Davis seeking further comment. Davis agreed to be interviewed by Ben Mieklejohn, a reporter for the Biddeford-Saco-OOB Courier ("the Article"). The Article, titled "Blowing the Whistle: A former BPD detective says the AG's office purposely [sic] threw a case against former police captain," appeared in the paper on May 14, 2015. Mieklejohn authored the Article and quoted Davis extensively. The alleged defamatory statements concern assertions by Davis that Eric Wright of the Attorney General's Office "threw" the Gaudette investigation and intentionally failed to rigorously pursue the allegations. The specific statements highlighted by Gaudette include the following:

> "Obviously it was all thrown under the rug. It was obviously worked out with Gene Libby and the attorney general."

> "[T]hen all of a sudden appears Gene Libby walking with Gaudette and his wife . . . and they walked right into the jury room and closed the door."

> "It was one big staged play."

2

"Davis said numerous detectives became involved in an investigation that yielded nearly a dozen people who were potential victims of Gaudette."

"We came up with numerous names. We interviewed people and ended up spitting names . . . Collectively, we came up with about a dozen names."

"After culling through nearly a dozen alleged victims, Davis said he believes a total of eight to [ten] names were generated as witnesses could testify about alleged abuse by Gaudette."

"That Assistant Attorney General Eric Wright 'continuously apologized for what he had just done [in the grand jury proceedings]' and that 'Eric Wright said he admits that he purposely [sic] threw the case under the bus to the grand jury . . . [h]e continuously apologized.'"

"That Attorney General Wright had alluded that 'he didn't want to, but he got it from higher up.'"

(Pl.'s Compl. ¶ 13.)

The statements made by Davis in the Letter echo the above, and further detail

Gaudette's alleged conduct and grand jury proceedings with Eric Wright:

"Both investigations identified numerous boys and young men who have alleged sexual abuse at the hands of Captain Gaudette. It also alleged that Captain Gaudette had furnished alcohol and drugs to more than one of the alleged victims."

"AAG Wright had made numerous comments to investigators that he wasn't crazy about having to go to Biddeford and deal with the Gaudette case. He felt the City of Biddeford had enough evidence against Gaudette to hold an administrative hearing to terminate him for conduct unbecoming and other reasons."

"Almost immediately after being sworn in [to the grand jury proceeding] AAG Wright began a verbal assault and humiliation of Detective Davis. He not only didn't ask any of the questions . . . instead he brought up the fact that Detective Davis's father had committed suicide years earlier from accusations that he had allegedly touched a girl inappropriately and was facing charges."

"Detective Davis was excused [from the witness stand] shortly after AAG Wright's unethical, unprofessional bashing and blindsiding of Detective Davis."

3

"As they [Detective Davis and Detective Gagne] were talking outside the jury room, Captain Gaudette, his wife, and his attorney, Gene Libby, arrived and went into the jury room apparently to testify on his own behalf."

"That Assistant Attorney General Wright 'admitted to the detectives that he did knowingly and purposefully threw the case under the rug, which was the grand jury case of Captain Gaudette, which started with Larry Ouellette's allegations of Detective Davis.'"

(Pl.'s Compl. ¶ 23.) According to Gaudette, the Letter also falsely states that (1) none of the alleged victims were called to testify at the grand jury proceeding, (2) AAG Wright appeared at the Biddeford Police Station following the grand jury and was told to leave by Davis, and (3) AAG Wright requested a meeting with the detectives at the Happy Dragon Restaurant, where he admitted to purposefully having "thrown" the case, apologized, and "may have stated that it came from 'higher ups.'" (Id. ¶ 24.)

## II. Discussion

Defendant has filed a special motion to dismiss under Maine's anti-Strategic Lawsuits Against Public Participation ("SLAPP") statute. The statute provides:

When a moving party asserts that the civil claims, counterclaims or cross claims against the moving party are based on the moving party's exercise of the moving party's right of petition under the Constitution of the United States or the Constitution of Maine, the moving party may bring a special motion to dismiss. The special motion may be advanced on the docket and receive priority over other cases when the court determines that the interests of justice so require. The court shall grant the special motion, unless the party against whom the special motion is made shows that the moving party's exercise of its right of petition was devoid of any reasonable factual support or any arguable basis in law and that the moving party's acts caused actual injury to the responding party. In making its determination, the court shall consider the pleading and supporting and opposing affidavits stating the facts upon which the liability or defense is based.

4

14 M.R.S. § 556. "The anti-SLAPP statute is designed to allow a defendant to file a special motion to dismiss a lawsuit that a plaintiff brings with the intention of chilling or deterring the free exercise of the defendant's First Amendment right to petition the government by threatening would-be activists with litigation costs." *Nader v. Me. Democratic Party*, 2012 ME 57, ¶ 14, 41 A.3d 551 (internal citation omitted).

Reviewing a special motion to dismiss under the anti-SLAPP statute follows a two-step analysis. The court must first determine whether the statute applies. The party moving to dismiss "carries the initial burden to show that the suit was based on some activity that would qualify as an exercise of the defendant's First Amendment right to petition the government." *Nader*, 2012 ME 57, ¶ 15, 41 A.3d 551. If the movant carries this burden, the court proceeds to the second step. At this step, the burden shifts to the non-moving party "to establish, through pleadings and affidavits, that the moving party's exercise of its right of petition (1) was 'devoid of any reasonable factual support or any arguable basis in law,' and (2) 'caused actual injury' to the nonmoving party." *Id.* ¶ 16 (citations omitted).

## A. The First Step: Whether Statute Applies

Davis contends that all the speech complained of by Gaudette is petitioning activity within the meaning of the statute, which defines "a party's exercise of its right of petition" as follows:

> [A]ny written or oral statement made before or submitted to a legislative, executive or judicial body, or any other governmental proceeding; any written or oral statement made in connection with an issue under consideration or review by a legislative, executive or judicial body, or any other governmental proceeding; any statement reasonably likely to encourage consideration or review of an issue by a legislative, executive or judicial body, or any other governmental proceeding; any statement reasonably likely to enlist public participation in an effort to effect such

5

consideration; or any other statement falling within constitutional protection of the right to petition government.

14 M.R.S. § 556. The Law Court has noted the "very broad terms" chosen by the Legislature evidencing intent to cover an array of activities; the Court has accordingly construed the statute "liberally" in determining whether statements constitute petitioning activity. *Schelling v. Lindell*, 2008 ME 59, ¶ 12, 942 A.2d 1226.

Davis explains that he allowed Lauzon to read the Letter at the Dutremble hearing in part "because I wanted the public and government officials to know that what had happened with those allegations was not right and that the Biddeford Police Department and Attorney General's Office had not handled the investigation correctly . . . I also believe that the city and state officials should know what happened so they make sure it doesn't happen again." (Davis Aff. ¶ 11.) Davis also gave Lauzon permission to share the Letter with Governor LePage. (Id. ¶ 12.) When Davis was contacted by the Saco-Biddeford-OOB Courier, he agreed to the Meiklejohn interview for largely the same reasons and additionally because individuals implicated in the prior investigation remain employed at the Biddeford P.D. (Id. ¶ 15.)

Davis's statements clearly fit within the broad definition of petitioning activity. The Letter was read at a forum held by a State Senator in an effort to encourage consideration or review of any potential mishandling of sexual abuse allegations by public employees and officials. The statements contained in the Article were similarly made as part of an effort to criticize the handling of the investigation by the Biddeford P.D., and thus encourage review or consideration of current leadership at the Department. Davis's statements thus fit easily within "any statement reasonably likely to encourage consideration or review of an issue by a legislative, executive or judicial body, or any

6

other governmental proceeding; any statement reasonably likely to enlist public participation in an effort to effect such consideration." 14 M.R.S. § 556.

Gaudette contends the statute should not apply in this case, notwithstanding its otherwise broad applicability. He argues that even if the statements qualified generally as petitioning activity, Davis was not petitioning on his own behalf, and not all of the claims brought in the amended complaint are based on those petitioning activities.

In *Warren v. Preti, Flaherty, Beliveau & Pachios, LLC*, the Superior Court (*Horton, J.*) held that in light of the similarities between the Maine and Massachusetts constitutions, the Law Court would likely follow Massachusetts case law limiting the application of anti-SLAPP to statements made in furtherance of the moving party's right to petition. No. CV-11-28, 2012 Me. Super. LEXIS 89, *63 (Mar. 12, 2012). Justice Horton concluded the anti-SLAPP statute did not apply in *Warren* largely because the moving party failed to identify or articulate a specific issue that the movant was affirmatively attempting to influence or enlist public participation to urge government to consider. *Warren*, 2012 Me. Super. LEXIS 89, at *64-66.

*Warren* is distinguishable on the facts[1] because Davis has identified a specific issue and carried his burden on step one. Gaudette would seemingly require Davis to have been the direct subject of sexual abuse in order for the statements to be in furtherance of his own rights or have made all the statements to be made by him directly to be considered protected petitioning activity. Neither the plain language of the statute nor Maine case law interpreting it compels such a narrow construction, particularly not in the present case. *See Maietta Constr., Inc. v. Wainwright*, 2004 ME 53, ¶ 7, 847 A.2d

---

[1] The court therefore need not reach whether the Law Court would follow prevailing Massachusetts case law adopted by Justice Horton.

1169 (stating attorney's statements to the media on behalf of their client "clearly amount[ed] to petitioning activity").

Davis made the statements in an effort to bring attention to the investigation that he believed was inadequate, to revive consideration of the issue of sexual abuse by former officers at Biddeford P.D., and to enlist public support to evaluate the leadership at the Department implicated in the investigation. Davis was directly involved in the investigation and made the statements with the understanding and intent that the statements he made in the Letter and the Article would be presented in the public sphere through the media and to government officials at the Dutremble hearing. The court thus concludes that Davis has met his burden to establish he engaged in "some activity that would qualify as an exercise of the defendant's First Amendment right to petition the government," and will proceed to the second step of the analysis. *Nader*, 2012 ME 57, ¶ 15, 41 A.3d 551.

## B.  Whether Petitioning Activity Was Devoid of Factual Support

At the second step, the burden shifts to the non-moving party, Gaudette, "to establish, through pleadings and affidavits, that the moving party's exercise of its right of petition (1) was 'devoid of any reasonable factual support or any arguable basis in law,' and (2) 'caused actual injury' to the nonmoving party." *Nader*, 2012 ME 57, ¶ 16, 41 A.3d 551 (citations omitted). There seems to be no dispute as to whether Gaudette has carried his burden on the second prong for the purposes of this motion.[2] This second step

---

[2] Gaudette has detailed actual injuries he alleges he suffered as a result of Davis's statements, including lost income and physical and mental injuries caused by loss of appetite, sleeplessness, and stress. (Gaudette Aff. ¶¶ 22-26.) Davis does not contest Gaudette's showing of actual injury, but focuses arguments on the first prong: whether the statements lacked any reasonable factual basis. The court concludes Gaudette's uncontested prima facie showing of actual injury recited in the affidavit is sufficient to meet the second prong.

8

therefore turns upon whether Gaudette puts forth prima facie evidence that any single one of Davis's petitioning statements lacked reasonable factual support. *See Nader v. Me. Democratic Party*, 2013 ME 51, ¶ 26, 66 A.3d 571 (requiring nonmovant show "at least one of the moving party's petitioning activities was 'devoid of any reasonable factual support'").

Gaudette carries this burden. The complaint, read together with the affidavits submitted by Gaudette and former Assistant Attorney General Eric Wright pinpoint several statements Davis made in the Letter and that appeared in the Article that Gaudette and Wright identify as false. Specifically, the Wright affidavit avers the claim that AG investigation and grand jury proceeding was deliberately thrown and Wright openly acknowledged this fact at the time is "totally false." (Wright Aff. ¶ 14.) Gaudette has thus produced some evidence of a sufficient quality to allow a fact-finder to infer that some of Davis's petitioning activity lacked a reasonable factual basis. The court makes no determination as to the truth or weight of the competing narration of events by the parties, but need not at this stage. *See Nader*, 2012 ME 57, ¶¶ 35, 52, 41 A.3d 551 ("Even when faced with conflicting evidence from a defendant, a plaintiff able to meet this 'low standard' could avoid dismissal of his or her claim.") Because Gaudette satisfies his prima facie evidentiary burden on the second step, the defendant's special motion to dismiss is denied.

## III. Conclusion

Based on the foregoing, the court concludes that the plaintiff has presented prima facie evidence that at least some of the petitioning statements made by the defendant lacked a reasonable factual basis. The special motion to dismiss is therefore denied.

9

The clerk shall make the following entry on the docket:

The Defendant's special motion to dismiss is hereby DENIED.

SO ORDERED.

DATE: October 26, 2015

_____
John O'Neil, Jr.
Justice, Superior Court

CV-2015-123

ATTORNEYS FOR PLAINTIFF:
GENE LIBBY
TARA RICH
LIBBY O'BRIEN KINGSLEY & CHAMPION
62 PORTLAND RD. SUITE 17
KENNEBUNK ME  04043

ATTORNEYS FOR DEFENDANT:
GEORGE DILWORTH
AMY KAY OLFENE
DRUMMOND WOODSUM
84 MARGINAL WAY SUITE 600
PORTLAND ME  04101

z